RAJ V. ABHYANKER, California SBN 233284
Email: raj@legalforcelaw.com

LEGALFORCE RAPC WORLDWIDE, P.C.
1580 W. El Camino Real, Suite 10
Mountain View, CA 94040
Telephone:   (650) 965-8731
Facsimile:    (650) 989-2131

Plaintiff and Attorney for Plaintiff,
LegalForce RAPC Worldwide, P.C.

## IN UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Legalforce RAPC Worldwide, P.C., Raj Abhyanker<br><br>Plaintiffs,<br><br>v.<br><br>United States Patent & Trademark Office,<br><br>Kathi Vidal, Under Secretary of Commerce for Intellectual Property and Director, United States Patent and Trademark Office, and<br><br>Gina Raimondo, U.S. Secretary of Commerce,<br><br>Defendants. | Case No.:<br><br>INITIAL COMPLAINT FOR:<br><br>DECLARATORY AND INJUNCTIVE RELIEF<br><br>**JURY TRIAL DEMANDED** |

**INTRODUCTION**

1.  Plaintiff LegalForce RAPC Worldwide PC, ("LegalForce") and its owner, Raj Abhyanker ("R.A.") brings this case to challenge the unconstitutional structure and existence of Defendant United States Patent and Trademark Office ("USPTO" or "Office"), which has ensnared Plaintiffs in unconstitutional agency proceedings. The USPTO's attorney discipline system exists as a constitutional anomaly. On one hand, it wields a mighty sword—the power to not only prosecute cases against attorneys, but to judge them, too; on the other, a massive shield—near-total protection from political accountability, with the Administrative Law Judges ("ALJs") who adjudicate actions subject to neither democratic election nor at-will removal by the President. For decades, the agency has leveraged that power against licensed practitioners to extort "settlements" to avoid a rigged forum where they can never win.

2.  In late 2017, after years of advocating for reform, LegalForce and R.A. sued the USPTO to address systemic inefficiencies and inequities. This lawsuit (N.D.Cal.: 3:17-CV-7194-MMC) marked a turning point, as the USPTO responded with a campaign of retaliatory investigations. R.A. has now found itself in the agency's clutches—not in a neutral federal court, but through its own biased administrative process that vests the USPTO with the powers of prosecutor, judge, and jury in violation of Article II; seeks to adjudicate core private rights in violation of Article III; and violates R.A.'s due process rights secured by the Fifth Amendment.

3.  Starting in Spring 2018, the USPTO began initiating *sua sponte* investigations into LegalForce and its attorneys, even in the absence of client complaints. These investigations targeted time-barred allegations and employed novel, untested theories of discipline, all while lacking evidence of client harm.

//

//

**JURISDICTION AND VENUE**

4.   This action arises under the Constitution and laws of the United States, and this Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331. S*ee generally Axon Enter., Inc. v. Fed. Trade Comm'n*, 598 U.S. 175 (2023) (holding that the FTC's statutory review scheme does not displace a district court's federal-question jurisdiction over claims challenging the constitutionality of the FTC's structure or existence such as the ones alleged here with respect to the USPTO).

5.   Venue is proper under 28 U.S.C. § 1391(e).

**PARTIES**

6.   For sixteen years, LegalForce has worked on a mission to enhance access to legal services to first time entrepreneurs and small businesses seeking to protect their intellectual property at an affordable price.   LegalForce is a California  and Arizona law firm, with a principal place of business at 1580 West El Camino Real Suite 10, Mountain View CA 94040; and an ancillary office at 440 E. Southern Avenue in Tempe Arizona in Maricopa County.

7.   Plaintiff R.A. is an owner of LegalForce, a licensed California patent attorney for over 20 years with no history of discipline, and a principal place of residence of Maricopa County in Arizona, and in Santa Clara County in California.

8.   The USPTO is an administrative agency under the United States Department of Commerce ("DOC") with a stated mission to deliver timely examination of patent and trademark applications. Among other things, the USPTO is empowered to initiate administrative proceedings, pursuant to 35 U.S.C. § 32, against registered patent practitioners, and trademark practitioners, for alleged violations of the USPTO Rules of Professional Conduct, under 35 U.S.C. § 32. The USPTO's principal place of business is located at 600 Dulany Street, Alexandria, VA 22314.

9. Kathi Vidal, Under Secretary of Commerce for Intellectual Property and Director, United States Patent and Trademark Office, in her official capacity as Director of the USPTO.

10. Gina M. Raimondo, U.S. Secretary of Commerce, U.S. Department of Commerce, in her official capacity as Secretary of the DOC.

## STANDING

11. Plaintiffs, LegalForce and its owner, R.A., have standing to bring this action because they have suffered concrete, particularized, and actual injuries directly traceable to the unconstitutional structure and actions of the USPTO. Plaintiffs have been subjected to unconstitutional administrative proceedings, causing harm to their professional reputations, financial interests, and fundamental due process rights. Specifically, R.A. has been deprived of a fair and impartial forum to contest allegations, with the USPTO acting simultaneously as investigator, prosecutor, and adjudicator, violating core constitutional protections under Articles II and III, the Fifth Amendment, and the Seventh Amendment.

12. The biased and procedurally flawed proceedings have caused reputational damage to LegalForce and R.A., impairing their ability to operate their business and earn a livelihood without unjust governmental interference. Plaintiffs' injuries are directly traceable to the actions and structure of the USPTO. The agency's unconstitutional dual-layer protections for ALJs, as well as its combined investigative, prosecutorial, and adjudicative functions, are the proximate causes of the harm suffered by Plaintiffs. These structural defects have deprived Plaintiffs of the ability to defend themselves in a neutral and lawful forum.

13. The injuries described are redressable through this Court's intervention. A declaratory judgment invalidating the USPTO's structure, including its ALJ protections and combined functions, would address Plaintiffs' injuries by restoring their right to a

fair hearing and terminating ongoing unconstitutional proceedings. Furthermore, injunctive relief prohibiting the USPTO from pursuing further actions under its current framework would prevent additional harm to Plaintiffs.

14. Plaintiffs' claims fall squarely within the framework of Article III standing as articulated by the Supreme Court in *Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992). Being subjected to unconstitutional administrative authority, as recently clarified in *Axon Enterprise, Inc. v. Federal Trade Commission*, 598 U.S. 175 (2023), constitutes a concrete and immediate injury sufficient to meet the injury-in-fact prong of standing.

15. Additionally, the structural constitutional challenges presented in this case—focused on violations of Articles II and III—are precisely the type of claims the Supreme Court has recognized as appropriate for immediate judicial review, even without the exhaustion of administrative remedies. Plaintiffs therefore seek relief directly from this Court under its federal question jurisdiction pursuant to 28 U.S.C. § 1331.

16. Thus, Plaintiffs meet all elements of Article III standing: they have suffered a concrete injury caused by the USPTO's unconstitutional practices, which this Court has the power to redress through appropriate declaratory and injunctive relief.

## FACTUAL BACKGROUND

17. LegalForce, a California and Arizona-based law firm recognized for its innovative legal practices, has long championed reforms to improve access to justice for small businesses while challenging wasteful bureaucratic practices at the USPTO. Under the leadership of its owner, R.A., LegalForce has tirelessly advocated for policies that reduce unnecessary regulation, eliminate wasteful spending, and streamline processes that impede efficiency and innovation within the USPTO.

18.  The firm has proposed reforms such as creating a licensed "trademark agent" class, allowing trained and qualified professionals to file and prosecute U.S. trademark filings without the assistance of a lawyer, thereby reducing barriers to entry and costs for small businesses. LegalForce has also been vocal about the need to eliminate excessive fees that disproportionately affect small business owners, and to modernize USPTO operations through the use of artificial intelligence. These AI-driven efficiencies could save taxpayers millions of dollars annually by automating tasks currently performed by hundreds of expensive trademark examining attorneys and patent examiners, many of whom work remotely under outdated systems.

19.  LegalForce has repeatedly pointed out that many of the USPTO's regulations do not protect clients or enhance outcomes, but instead create unnecessary roadblocks to justice and delay the examination process for trademarks and patents. The firm has emphasized that these bureaucratic inefficiencies harm entrepreneurs and stifle innovation.

20.  However, this steadfast commitment to reform has not come without cost. While LegalForce has garnered support and praise for its efforts, it has also made powerful enemies, including entrenched bureaucratic interests intent on preserving government jobs, protecting lawyer monopolies, and maintaining outdated regulatory frameworks. These adversaries have aligned to resist the changes advocated by LegalForce, creating an environment of hostility and retaliation.

21.  By the summer of 2018, after being unable to find credible witnesses among LegalForce employees or clients to support its narrative, the USPTO turned to its own ranks, its own USPTO employees: former LegalForce-affiliated trademark examining attorneys, John Salcido ("Salcido") and Udeme Uwan ("Uwan"), as well as a former LegalForce attorney and head of a USPTO authorized trademark clinic at the Lincoln Law School, Mitesh Patel ("Patel") by implying that these individuals would avoid

disciplinary investigations if they testified unfavorably about LegalForce. In exchange for compliance, these witnesses were spared scrutiny of admissions they made of their own conduct.

22.  The USPTO also sought to undermine LegalForce by directly contacting the firm's clients, searching for any potential wrongdoing. This resulted in more than a dozen investigations targeting LegalForce attorneys who failed to conform to the USPTO's desired narrative. These investigations all concluded with stipulated settlement agreements for minor rule violations of administrative signature errors, which caused no client harm and had no material impact on trademark rights.

23.  The retaliatory actions escalated further on December 23, 2019, just two days before Christmas. Shortly after R.A. was invited to interview for a regional director position at the USPTO—a role that would have allowed him to advance the very reforms he had long advocated—the USPTO intensified its actions. It filed formal charges against R.A. based on additional novel theories of *respondeat superior* of licensed U.S. lawyers, allegations which have never been brought against anyone in the USPTO's entire history besides R.A., and which also created no client harm.

24.  On January 6, 2020, the ALJ issued a Notice of Hearing and Order scheduling this matter for a hearing to commence on April 14, 2020, in Washington, D.C. The next day, R.A. moved the Court to change the hearing location to Mountain View, California in Santa Clara County. The ALJ agreed to the change of venue on January 22, 2020, noting that the hearing as requested by R.A. will enable the Court to receive live, in-person testimony of these witnesses, which the ALJ commented is usually preferred over alternatives.  Further, the ALJ noted that it strived to secure a neutral physical venue to conduct the hearing, such as a courtroom in a federal or state courthouse to ensure fairness.

25.  On March 9, 2020, the USPTO filed a motion to disqualify Michael E. McCabe, Jr. as counsel for R.A. arguing he was a necessary party.  For over a decade, Mr. McCabe continually served as counsel to R.A. and LegalForce, providing in-depth guidance on ethical practices and operations of LegalForce.  Mr. McCabe understood the factual predicate with a depth of understanding for which is impossible to find a substitute given his experience, familiarity with the witnesses, and frivolity of the factual allegations.[1]  On March 19, 2020, the Tribunal granted the USPTO's motion to disqualify Mr. McCabe relying on the USPTO's assertion that he was a necessary party.

26.  Years passed, with no hearing scheduled.   On January 21, 2022, the Court unilaterally modified the format of the hearing over R.A.'s objections to a videoconference hearing.  In a March 1, 2022 speech to Congress, President Biden said the federal workforce should serve as a model for more Americans to return to the office, and directed the "vast majority" of federal employees to return to the office next month.

27.  On March 30, 2022, the departments of Commerce and Housing and Urban Development (who is administering this Hearing on behalf of the USPTO), at the Biden administration's urging, brought tens of thousands of federal employees back to the office starting April 25, 2022.

28.  On May 8, 2022, R.A. made a last plea Renewed Motion for an In-Person Hearing, which the Court denied.

29.  On May 9, 2022, the Hearing commenced via videoconference, with R.A.'s new counsel objecting to the format of the hearing being via videoconference, and reserving

---

[1] Mr. McCabe, managing partner at McCabe & Ali LLP, is a registered patent attorney with over 30 years of experience in intellectual property law, specializing in ethics and malpractice issues. His extensive experience includes representing patent and trademark practitioners in ethics proceedings before the USPTO and state bars. Mr. McCabe has represented hundreds of IP professionals in ethics matters before the USPTO.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

all rights to later appeal. The USPTO never deposed Mr. McCabe or called him at the Hearing, contrary to the USPTO's representations which led to his disqualification.

30. At numerous points during the Hearing, there were technical issues including with video feed being frozen and extraneous noise. The ALJ had ordered the parties (and witnesses) to not engage in communications with other witnesses during the Hearing (*i.e.*, rule on witnesses). Despite this, during the 4th day of the Hearing (May 12, 2022), USPTO employee Salcido admitted violating this order by communicating via text and phone with another USPTO witness Patel regarding mental impressions and contents of testimony given during the hearing in a night prior to Patel's testimony, and then deleting evidence text messages and call log history because he thought these records might hurtful to him and the USPTO's case against R.A. had he not deleted.

31. Partially due to the technical difficulties and those issues, the Hearing was paused on May 13, 2022, given there was not sufficient time for R.A. to testify. Given the stakes, on May 16, 2022, R.A. filed a Motion for Interlocutory Appeal and Stay pending Resolution of Live Hearing Request (the "May 2022 Motion"). On May 23, 2022, the Court denied the May 2022 Motion.

32. On July 22, 2022, Respondent filed a motion to reinstate Mr. McCabe counsel for Respondent in view of the fact that the USPTO misrepresented that he was a necessary witness. Seven months passed. Then, on February 15, 2023, the ALJ denied R.A.'s motion to permit R.A. to seek the assistance of Mr. McCabe. Disqualifying Mr. McCabe deprived R.A. of an attorney uniquely qualified to navigate the complex ethical and legal issues in this case. His unparalleled familiarity with the facts and longstanding professional relationship with R.A. and LegalForce in ethical compliance matters before the USPTO made him indispensable to the defense.

33. That same day, February 15, 2023, R.A. sought a stipulation and meet and confer with the USPTO asking that: (i) they consent to Mr. McCabe serving as trial

COMPLAINT
CASE NO.:

counsel for R.A. in light of the fact he was not a necessary witness (and indeed, he had never been subpoenaed to testify), (ii) the remainder of the case be conducted in person in San Jose, California (as previously ordered by the same ALJ), and (iii) the parties stipulate to a hearing date later in the summer. The USPTO's counsel opposed those requests.

34. On February 14, 2023, the ALJ issued an "Omnibus Ruling." However, the ALJ docket clerk sent the "Omnibus Ruling" to the wrong counsel–specifically, to R.A.'s former counsel, ignoring the instructions in the Notice. Fortunately, the Omnibus Ruling was subsequently forwarded by former counsel to R.A. a day later. The Omnibus Ruling set a date for the Hearing *sua sponte* a little over just two months later, on April 18, 2023. R.A. objected to the new schedule on the ground that there simply was not enough time between the notice date and the new Hearing date scheduled for R.A. to identify and engage new counsel and to enable such new counsel to get up to speed on the complexity of the facts in this case spanning a time period a decade old (2013 to 2015). The disqualification of Mr. McCabe was pretextual, aiming to undermine R.A.'s defense by removing his most capable advocate at a critical juncture, causing unnecessary delays.[2]

35. On February 16, 2023, R.A. argued in a Motion on Hearing Scheduling that he would be severely prejudiced by this shortened schedule in addition to this Hearing being fully via videoconference, explaining a short five to six months delay in the Hearing date would not inconvenience the Office of Enrollment and Discipline ("OED") Director for the USPTO as it took this Court nearly ten months to rule on the pending motions, and it had already been over three years since the Complaint was

---

[2] The final disqualification of Mr. McCabe compelled R.A. to have to represent himself *pro se* because of the impossibility of being provided less than 2 month timeframe to get new counsel up to speed on decades old facts, thereby compromising the fairness of the proceedings.

1    filed.    The ALJ declined this motion.    The hearing subsequently recommenced and

2    concluded starting on April 20, 2023, with R.A. appearing *pro se*.

3        36.   Administrative delays to R.A.'s case have been extraordinary. It took another

4    1.5 years from the conclusion of the hearing until an "Initial Decision" was finally

5    issued on November 22, 2024—nearly five years later from the filing of the Complaint.

6    Hearing officers in OED disciplinary cases are required to "make initial decisions" and

7    "perform acts and take measures as necessary to promote the efficient, timely, and

8    impartial conduct of any disciplinary proceeding."   37 CFR 11.39(c)(9) and (10).   As a

9    matter of law, the hearing officer "shall set times and exercise control over a

10   disciplinary proceeding such that an initial decision . . . is normally issued within nine

11   months of the date a complaint is filed."  37 CFR 11.39(d).  The rules permit a hearing

12   officer to "issue an initial decision more than nine months after a complaint is filed" but

13   only "if there exist circumstances, in his or her opinion, that preclude issuance of an

14   initial decision" within nine months of filing of the Complaint.  *See* 37 CFR 11.39(d).

15       37.   Here, the Complaint was filed in December 2019.   Thus, pursuant to Section

16   11.39(d), an initial decision was due by September 2020 unless the ALJ demonstrated

17   "circumstances" that rendered it impossible (*i.e.*, "precluded issuance of an initial

18   decision") in a timely fashion.  In a footnote in the initial decision, the ALJ identified as

19   his "excuse" for failing to issue an initial decision until November 2024 based on the

20   Covid pandemic (which ended two years earlier) and further unexplained lack of

21   resources–neither of which explained why it took 60 months from the filing of the

22   complaint to the issuance of an initial decision.

23       38.   Notably, the very same ALJ had issued multiple decisions before R.A.'s

24   decision and did so in cases that had been filed after R.A.'s complaint was filed.  Thus,

25   the ALJ's "excuses" for failing to timely issue an initial decision are demonstrably

26   false.  Moreover, the initial decision fails to explain beyond just a conclusory "blame it

on the pandemic" or "blame it on agency finances" for his excuse in violating 37 CFR 11.39(d). These purported delays fail to show why the ALJ was "precluded" from issuing an earlier decision, and they are disingenuous in light of the fact that the same ALJ had already issued multiple earlier decisions on matters filed after R.A.'s complaint was filed.

39. The initial decision itself was rife with factual inaccuracies, mischaracterizations, and procedural errors. For example, the ALJ relied on allegations not included in the original complaint and invoked questionable tolling arguments to circumvent the statute of limitations, while also stating that the underlying factual predicate was time barred. While R.A. filed a motion for reconsideration of the initial decision on December 2, 2024, the agency's legal counsel took the erroneous position that the rules do not allow an administrative law judge to reconsider an initial decision.[3] This morning of December 4, 2024, the ALJ has notified R.A. that he has now taken the reconsideration motion into submission and will rule on it by the weekend. At this point, Plaintiffs are done with the chaotic, extensively delayed, and unfair process; and opt to challenge the regulatory framework as a whole.

40. LegalForce and R.A. have not exhausted administrative remedies because the delays and the USPTO's systemic bias have prompted this action, which concerns the overall structure of the proceedings under the *Axon Enterprise, Inc. v. Federal Trade Commission,* 598 U.S. 175 (2023), and not on the underlying facts of matter pending before the ALJ.

---

[3] For the USPTO, motions for reconsideration are implicitly supported by the APA's general authority under 5 U.S.C. § 556(c) to "receive relevant evidence" and explicitly governed by 37 C.F.R. § 11.56(c), which allows for a motion for reconsideration of the USPTO Director's final decision. While this explicitly applies to final decisions, Respondent relies on this authority to permit the ALJ to proactively address determinative, specific factual and legal errors that materially affect the outcome of the proceedings.

41. The present lawsuit challenges the USPTO's authority and the structural deficiencies in its disciplinary framework, which subject practitioners to unconstitutional and biased proceedings. This challenge is brought while the case is still before the ALJ, and before any final order has been issued, in an effort to address the overarching inequities and violations of constitutional principles.

**THE NATURE OF THE USPTO ADMINISTRATIVE PROCEEDINGS**

**Committee on Discipline process**

42. The Committee on Discipline ("COD") is a body within the USPTO that plays a crucial role in the enforcement actions of the OED. Established under 37 C.F.R. § 11.23, the COD is composed of at least three, internal, USPTO employees, each of whom must be a member in good standing of the bar of the highest court of a state. The COD members are co-workers of the USPTO prosecutor and the USPTO's key witness Salcido. The COD members are appointed by the USPTO Director, and are not elected or external to the USTPO. Since the USPTO Director issues Final Orders, the COD rules gives deference to the OED in its decision making, and the selection process of the COD members is conditioned upon that deference.

**Interagency Agreement**

43. The USPTO does not have its own Administrative Law Judges for disciplinary hearings. Since March 27, 2013, Administrative Law Judges ("ALJs") from the Department of Housing and Urban Development ("HUD") have been "borrowed" by the U.S. Patent and Trademark Office to hear cases brought by the USPTO, including those involving its OED. This arrangement, which is memorialized in an "interagency agreement," allows HUD ALJs to adjudicate USPTO disciplinary proceedings under the statutory authority of 35 U.S.C. § 32 and regulatory authority of 37 C.F.R. Part 11.

44. Under this agreement, HUD ALJs conduct hearings in USPTO disciplinary cases, review evidence, testimony, and legal arguments presented by OED and

practitioners, and issue initial decisions and orders, which are subject to review by the USPTO Director.

45.  The USPTO-HUD interagency agreement requires an initial decision to be rendered by the assigned ALJ "within six months after the complaint is filed unless there are unusual circumstances which preclude issuance of an initial decision within six months of the filing of the complaint."

46.  The USPTO Director retains the authority to review and make the final decision on disciplinary matters. The USPTO compensates HUD ALJs for their services through a cost-sharing or reimbursement mechanism defined in the interagency agreement.

**The USPTO's Home-Court Advantage**

47.  Over nearly 25 years of administrative adjudication and hundreds of cases brought, the USPTO always prevails.[4] A perfect (or essentially near-perfect), decades-long administrative track record is far afield from any reasonable expectation of the outcomes of litigation. Indeed, the only plausible explanation for the USPTO's immaculate record is the obvious one: the USPTO's practices and procedures are so stacked against practitioners that they simply cannot win.   And a regulator who believes it cannot lose has no incentive to settle or compromise a disputed case. Instead, emboldened by the hubris that comes along with never losing, the OED Director essentially refuses to settle except on terms that are objectively outrageous.[5]

---

[4] Analysis of USPTO published cases show that the USPTO prevailed in 100% of the cases it brought, if the 2.5% in which a practitioner transferred to disability inactive status are excluded.:   https://www.trademarkia.com/useful-tools/oed.   There is one rumored, single unpublished decision, evidently issued about a decade ago, in which a practitioner prevailed in an appeal to the USPTO Director; however, Plaintiffs are unable to verify this information.

[5] See *Axon*, 598 U.S. at 216 & n.4 (Gorsuch, J. concurring) (Because "few can outlast or outspend the federal government, agencies sometimes use this as leverage to extract settlement terms they could not lawfully obtain any other way."); *see also* Philip Hamburger, *Purchasing Submission: Conditions, Power, and Freedom* 223 (2021) (describing "regulatory extortion").

Most notably, the USPTO's aggressive stance has earned it a rebuke from the 4th Circuit for its lax safeguards, along with a handful of *Bivens* actions against the OED Director and his team.[6]

48.   Unlike other LegalForce attorneys, R.A. twice rejected the USPTO's unreasonable settlement demands, thus leaving R.A. no choice but to continue his defense of the administrative case while pursuing these Constitutional claims in parallel.

## COUNT I

(Dual-Layer Removal Protections Afforded USPTO ALJs Violate Article II)

49.   Plaintiffs restate and incorporate by reference each allegation of the preceding paragraphs.

50.   In September 2008, the Secretary appointed HUD's Chief ALJ, J. Jeremiah Mahoney, pursuant to 5 U.S.C. 3105 for the Department of Housing and Urban Development as a chief administrative law judge of HUD.

51.   On January 6, 2020, the HUD's ALJ Mahoney, was assigned to preside over the proceedings of R.A., USPTO Docket No. D2020-03.

52.   As Judge, ALJ Mahoney exercises significant authority under the laws of the United States, including receiving evidence, conducting hearings, administering oaths, ruling on motions, regulating the conduct of parties and counsel, and making and filing initial decisions. 37 C.F.R. § 11.54 and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 556-557.

53.   ALJ Mahoney is an Officer of the United States under Article II.

54.   Under *Lucia v. SEC*, 138 S. Ct. 2044 (2018), ALJ Mahoney is a principal officer subject to the Appointments Clause.

---

[6] *See Goldstein v. Moatz*, 364 F.3d 205, 219 (4th Cir. 2004) ("Under the OED's current system, nothing but good conscience would prevent an OED investigator from requiring responses to an unlimited and burdensome array of questions by noon tomorrow and bringing charges against an attorney who fails to comply.").

55. But, as an ALJ, ALJ Mahoney may not be removed except for "good cause," as established and determined by someone other than the President—namely, the Merit Systems Protection Board ("MSPB"). 5 U.S.C. § 7521(a). And the President may not remove MSPB members except for "inefficiency, neglect of duty, or malfeasance in office." § 5 U.S.C. § 1202(d).

56. As a result, neither the President, nor anyone directly responsible to him, has the power to remove ALJ Mahoney at will—or even to determine whether good cause exists for his removal. That is contrary to Article II under *Free Enterprise Fund v. Public Company Accounting Oversight Bd.*, 561 U.S. 477 (2010).

57. The dual-layer protection afforded ALJ Mahoney is unconstitutional, and any actions taken against practitioners under this present structure are invalid and *void ab initio*.

## **COUNT II**

### (The USPTO's Structure Violates Article III)

58. Plaintiff restates and incorporates by reference each allegation of the preceding paragraphs.

59. Article III commands that "[t]he judicial Power of the United States, shall be vested in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish." U.S. Const. art. III, § 1.

60. Cases involving deprivations of life, liberty, or property fall within the core of the judicial power and must be resolved by Article III courts.

61. The USPTO's administrative complaint and ALJ's initial decision against R.A. seeks a suspension of R.A. from practice before the USPTO.

62. The disciplinary action primarily affects private rights (*e.g.*, R.A.'s right and ability to practice his chosen profession or earn a livelihood as a licensed attorney). The disciplinary action thus constitutes action by the government to deprive R.A. of his liberty and property interests.

63. Because federal administrative agencies are part of the Executive Branch, they do not have power to adjudicate claims involving core private rights.

64. When private rights are at stake, as here, full Article III adjudication is required.

65. Courts traditionally require evidence of actual harm or intent to harm before imposing punitive sanctions.

66. In this case, R.A.'s alleged actions harmed no clients.

67. USPTO disciplinary proceedings should focus on protecting the public, not punishing practitioners absent a clear risk for harm.

68. Imposing a punitive sanction like suspension or exclusion without evidence of harm to clients exceeds the USPTO's regulatory mission to ensure competence and ethics in practice before it.

69. The penalty appears punitive rather than corrective, as it seeks to penalize the practitioner for alleged harm to associate attorneys—an issue beyond the scope of the USPTO's direct regulatory mandate and unrelated to client protection.

70. The USPTO's administrative complaint failed to give notice to R.A. that he was being charged with, or subject to punishment for, alleged "harm to associate attorneys." The USPTO's complaint did not allege such "harm to associates." The first time the "harm to associates" "finding" was made was in the initial decision, issued nearly five years after the complaint was filed.

71. The Due Process Clause of the Fifth Amendment guarantees notice of charges and an opportunity to respond. These protections apply to disciplinary proceedings that threaten significant penalties like suspension or exclusion, thereby implicating the protections afforded by the Due Process Clause.

72. R.A. was denied the opportunity to address or rebut these claims, violating fundamental principles of fairness and due process.

73.  By relying on unalleged harm to third parties as a basis for discipline, the USPTO exceeded its regulatory mandate and encroached on areas traditionally reserved for Article III courts.

74.  The ALJ excused the USPTO's key witness Salcido  deletion of text messages and call history during the hearing, as benign despite Salcido admitting that he had deleted the relevant evidence because he was concerned that the evidence would harm himself and the USPTO's case.

75.  Expanding disciplinary authority to include punitive sanctions for unalleged or indirect harm risks creating a chilling effect on practitioners, discouraging innovation or vigorous representation of clients.

76.  *Axon* allows such structural due process claims to bypass the administrative process and proceed directly to federal court.

77.  The USPTO system combines in one agency investigatory, prosecutorial, and adjudicative powers.  By including in one executive agency powers to investigate, prosecute, and adjudicate claims raising significant Constitutional issues, the USPTO's disciplinary process  violates the principle of separation of powers.

78.  The appellate review scheme of 35 U.S.C. § 32 and as defined in the APA: 5 U.S.C. §§ 701–706 improperly vests the USPTO with primary authority to adjudicate core private rights with only highly deferential judicial review on the back end. Indeed, "if supported by evidence," the Article III court must treat the USPTO's findings of fact as "conclusive" and cannot take its own evidence. *Id.*

79.  This "appellate review model" violates separation of powers by placing adjudicatory authority over core private rights—a judicial rather than executive power—within the authority of Article II agencies. It violates Article III by compelling the Judiciary to defer to administrative agencies regarding matters within the core of the Judicial Vesting Clause. It violates practitioners due process rights by empowering

entities that are not courts of competent jurisdiction to deprive citizens of core private rights. And it runs afoul of the Seventh Amendment by allowing an administrative agency to adjudicate core private rights without a jury.

80.  Accordingly, the USPTO's structure and existence as it relates to the adjudication of core private rights is unconstitutional.

## COUNT III

(The USPTO's Combined Function Structure Violates R.A.'s Due Process Rights)

81.  Plaintiff restates and incorporates by reference each allegation of the preceding paragraphs.

82.  It is axiomatic that a fair trial in a fair tribunal is a basic requirement of due process. And this requirement applies to administrative agencies and to courts.

83.  The USPTO's structure, which combines multiple critical functions—investigatory, prosecutorial, and adjudicative—in a single agency, violates a practitioner's due process rights.

84.  An administrative proceeding in which the USPTO acts as prosecutor, judge, and jury deprives a practitioner of the ability to make its case before a neutral arbiter.

85.  The fact that USPTO administrative law judges both initiate and finally adjudicate their administrative complaints not only violates the adage that justice must satisfy the appearance of justice, but constitutes impermissible prejudging of the merits of the action.[7]

86.  Unconstitutional potential for bias exists when the same person serves as both accuser (*e.g.*, the COD appointment by the USPTO Director), the prosecutor (the Office of the Solicitor of the USPTO, reporting to the USPTO Director), the trier of fact (the

---

[7] See Andrew N. Vollmer, *Accusers as Adjudicators in Agency Enforcement Proceedings*, 52 U. Mich. J. L. Ref. 103, 145 (2018) (explaining in ALJ context that when "Commissioners have a direct, personal role in critical decisions of initiating enforcement cases by the agency they head" it "create[s] an unconstitutional potential for bias") (Doc.15-2 at 71).

ALJ whose salary is paid for by the USPTO Director), and the final decision maker (the USPTO Director) in a case.

87.  Far more than the mere combination of investigative and adjudicative functions, the USPTO's inherently biased structure has created an unprecedented perfect (or near perfect) win streak in administrative proceedings in the past quarter-century.

88.  With a federal court win rate closer to 50% when Article III protections are in place, special facts and circumstances exist demonstrating an intolerably high risk of unfairness in USPTO administrative proceedings.

89.  The USPTO combines investigatory, prosecutorial, and adjudicative roles in a manner that undermines impartiality and violates fundamental principles of fairness enshrined in the Constitution.

90.  Respondents are currently subject to disciplinary proceedings initiated by the USPTO, where members of the USPTO staff serve as investigators, prosecutors, and decision-makers, with no meaningful separation of functions.

91.  Plaintiff is denied the procedural protections afforded in Article III courts or even independent administrative tribunals, including impartial adjudication by a neutral decision-maker.

92.  The USPTO process operates without adequate transparency or procedural safeguards, leaving Plaintiff vulnerable to arbitrary and biased decision-making.

93.  Plaintiffs have no meaningful judicial review of this USPTO clearance procedure under the USPTO regulatory scheme, and thus should be able to raise it in district court because practitioners are deprived of the substantive or procedural protections enjoyed by litigants in federal district court.

94.  Accordingly, the USPTO's combined-function structure is unconstitutional.

//

## **COUNT IV**

(USPTO's Administrative Adjudication of Private Rights Violates the Seventh Amendment)

95.  Plaintiff restates and incorporates by reference each allegation of the preceding paragraphs.

96.  The Seventh Amendment guarantees the right to a jury trial in legal disputes at common law. The use of Department of Housing and Urban Development (HUD) Administrative Law Judges (ALJs) in USPTO adjudicative proceedings violates this fundamental right by introducing adjudicators who are neither structurally independent nor ethically insulated from conflicts of interest.

97.  In *SEC v. Jarkesy*, 144 S.Ct. 2117 (2024), the Supreme Court held that administrative proceedings adjudicating legal claims traditionally resolved at common law must comply with the Seventh Amendment's jury trial requirements. The Court also emphasized the dangers of combining prosecutorial and adjudicative roles within a single agency, which undermines the structural separation of powers and the appearance of impartiality.  The Court also emphasized the constitutional necessity of impartiality in administrative adjudications, particularly where the proceedings involve core private rights.

98.   The USPTO's HUD ALJs adjudicate disputes involving practitioner conduct—without providing access to a jury trial or an independent judicial forum. These proceedings are legal in nature, as they involve property rights akin to common law rights to earn a living in a chosen profession resolved by juries.

99.  The ethical framework governing USPTO assigned HUD ALJs compounds the constitutional concerns by failing to ensure independence and impartiality. For example:

    a.  **Control by the USPTO:** HUD ALJs are compensated for their work on USPTO cases by the USPTO Director, which is also responsible for issuing Final Orders, creating inherent conflicts of interest.

b. **Lack of Oversight:** Unlike Article III judges, HUD ALJs are not subject to independent ethical oversight and lack the structural protections necessary to guard against undue influence from the agency that employs them.

c. **Bias in Decision-Making:** As noted in *Jarkesy*, administrative adjudication processes that consistently favor the agency undermine confidence in the impartiality of the proceedings and raise ethical concerns about the fairness of decisions.

100.   This complaint highlights specific issues with the USPTO's adjudicative process, including the lack of transparency and the agency's significant win rate in ALJ proceedings. Similar to *Jarkesy*, this demonstrates an "unhealthy and biased institutional process" that prioritizes agency outcomes over impartial adjudication.

101.   The USPTO's administrative framework fails to separate investigatory, prosecutorial, and adjudicative functions, in violation of constitutional due process requirements. The agency acts as prosecutor by challenging practitioners for alleged violations of USPTO rules, as investigator by controlling evidence collection, and as judge by deciding disputes—all while employing the very ALJs responsible for rendering these decisions.

102.   Cases involving suspension or exclusion from practicing before the USPTO directly impact an individual's ability to earn a livelihood, a property interest protected under the Fifth Amendment's due process clause.  These matters are akin to common law disputes involving punitive remedies, which traditionally require jury trials under the Seventh Amendment.

103.   The use of Administrative Law Judges (ALJs), particularly contracted ALJs from external agencies (e.g., HUD), compromises the independence and impartiality of the adjudicative process.

104.    Contracted ALJs are financially and procedurally tied to the agency they serve, raising concerns about bias or conflicts of interest in cases where the USPTO has a direct stake in the outcome.

105.    Many USPTO disputes involving direct hire ALJs, such as patent or trademark validity challenges, do not impose penalties on individuals that affect their personal livelihood in the same way as suspension or exclusion cases do.

106.    The high stakes of suspension or exclusion cases warrant special procedural protections, such as the availability of a jury trial and adjudication in an impartial Article III forum.

107.    Suspension or exclusion effectively bars individuals from their chosen profession, a penalty that carries significant economic and reputational harm. Such severe consequences demand a neutral and constitutionally compliant adjudicative process to ensure fairness.

108.    In *Jarkesy*, the Supreme Court ruled that administrative adjudications seeking punitive remedies (such as civil penalties) are legal in nature and require jury trials under the Seventh Amendment.

109.    The *Jarkesy* decision underscores that such a structure violates foundational principles of due process and fairness. The USPTO's ALJ system fails to meet ethical standards of independence and neutrality, depriving parties of their Seventh Amendment right to a fair trial by an impartial tribunal.

110.    The USPTO's HUD ALJ process also fails to safeguard the constitutional right to a jury trial in matters involving core private rights. By delegating these disputes to ALJs contracted by USPTO at HUD and bypassing Article III courts, the agency denies parties their Seventh Amendment protections.

111.   The lack of an independent ethical framework governing USPTO ALJs further erodes public trust and violates the Seventh Amendment, which requires jury trials for legal claims that historically fell under common law jurisdiction.

**PRAYER FOR RELIEF**

112.   WHEREFORE, Plaintiffs respectfully requests that this Court enter judgment in its favor and against the USPTO and Defendants as follows:

a) Hold the dual-layer insulation of USPTO ALJs from Presidential control contrary to Article II;

b) Hold the removal procedures governing USPTO ALJs contrary to Article II;

c) Hold the USPTO's structure unconstitutional;

d) Direct the Commission to dismiss the administrative complaint against R.A.;

e) Issue a declaration that the USPTO's use of HUD ALJs violates the Seventh Amendment and due process protections under the Constitution.

f) Issue an injunction prohibiting the USPTO from engaging HUD ALJs in proceedings involving core private rights without implementing structural safeguards to ensure impartiality and independence.

g) Issue a mandate requiring the USPTO to restructure its adjudicative framework to comply with constitutional requirements for jury trials and impartial adjudication in cases involving charges asking for suspension or exclusion.

h) Award R.A. his reasonable costs, expenses, and attorney's fees incurred in bringing this action; and

i) Award such other and further relief the Court deems just and proper.

1

Respectfully submitted this Wednesday, December 4, 2024.

2

3

LEGALFORCE RAPC WORLDWIDE P.C.

4

5

/s/ Raj V. Abhyanker

6

Raj V. Abhyanker

7

Plaintiff and Attorney for Plaintiff:
LegalForce RAPC Worldwide, P.C.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT
CASE NO.:

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 4, 2024 the foregoing was filed electronically with the Clerk of Court to be served by operation of the Court's CM/ECF system.

Respectfully submitted this Wednesday December 4, 2024.

LEGALFORCE RAPC WORLDWIDE P.C.

By   /s/ Raj V. Abhyanker
Raj V. Abhyanker
Plaintiff and Attorneys for Plaintiffs:
LegalForce RAPC Worldwide, P.C.

COMPLAINT
CASE NO.: